# Lycoming Natural Gas Corporation et al. v. Searle et al.

*Archibald F. Jones, Crichton & Owlett, Chester H. Ashton, Denton Borger* and *James S. Berger,* for plaintiff.

*W. F. Du Bois* and *James O. Sebring,* for defendant.

Lewis, P. J., June 26, 1933.—By written articles of agreement dated September 11, 1926, Mrs. Gertrude E. Carmer purchased from Mrs. Tillie Bly, a widow, the land concerned in this controversy for $800. The land contract was not recorded.

Mrs. Carmer went into possession of the land and, so continuing, made payments on account of principal and interest until, on January 7, 1932, there was unpaid upon the contract $400 principal and $75.92 interest.

While so seized of the equitable title and in possession of the land, Mrs. Carmer and her husband, Roswell Carmer, executed and delivered on October 8, 1930, a valid oil and gas lease, by which the land was "granted, demised, leased, and let" to Peoples Natural Gas Company of Pittsburgh, Pa., its successors and assigns, "for the sole and only purpose of mining and operating for oil and gas . . . for the term of 10 years . . . and as long thereafter as the land is operated by the lessee in the search for or production of oil or gas". The lease was recorded November 1, 1930. It provided for the payment of delay rental until a producing well was drilled on the premises, a one-eighth royalty of the oil and in lieu of a fractional royalty of the gas a fixed rental for each gas well, payable quarterly.

By a valid assignment duly recorded, the rights of the lessee were vested in the plaintiff, Lycoming Natural Gas Corporation, on March 31, 1931, and in the intervening plaintiff, Lycoming Producing Corporation, on June 15, 1932.

The lessee and its successors in title fully performed everything required of them by the terms of the lease.

About December 1, 1931, a large gas well producing from seven to ten million cubic feet of gas per day was completed near the land in controversy and within 1½ miles thereof. Thereby the gas rights in the land became much more valuable than they were at the time the lease was executed.

On January 7, 1932, Mrs. Carmer, her husband, Roswell Carmer, the defendant Searle, and one Harry B. Slone went to the home of Tillie Bly at East Concord, N. Y. The Carmers, Searle, and Slone all had actual knowledge of the land contract, the large gas well and the lease. Mrs. Bly, of course, knew of the contract, but apparently had little, if any, knowledge of the large gas well and its influence upon the value of the land she had contracted to convey to Mrs. Carmer. She had at least constructive knowledge of the lease. She was not pressing Mrs. Carmer for payments.

Mrs. Bly and Mrs. Carmer executed and acknowledged what is termed a "surrender agreement", by the terms of which Mrs. Carmer did "hereby sell, transfer, assign, grant, *convey*, and surrender" the contract and all her right, title and interest therein and thereunder, and the parties. mutually released each other from all liability under the contract. Roswell Carmer, the husband of Gertrude E. Carmer, was present when the surrender agreement was executed but did not join therein nor in the acknowledgment thereof. The amount remaining unpaid upon the land contract was discussed. Mrs. Bly produced her account book showing what payments had been made upon the contract and, at her request, Searle computed the balance due upon the contract. To this total amount was added the sum of $30 which Mrs. Carmer had borrowed from Mrs. Bly's mother, making a total of $505.92.

Mrs. Bly executed and acknowledged a deed conveying the land in controversy to Searle and enclosed it in a letter, signed by her, addressed to First Trust Company of Wellsville, N. Y., in which she directed that company to deliver her deed to Searle upon the payment for her account of $505.92, with direction to forward her that sum in form of New York draft or cashier's check payable to her order. Searle had caused the surrender agreement, deed, and letter to be prepared in advance of the meeting.

At Searle's suggestion, Mrs. Bly permitted him to carry away from her home the letter and deed to mail to the trust company. Searle recorded the deed on January 11, 1932. It contained no reference whatever to the land contract or to the lease. No notice of Mrs. Carmer's intention to surrender was given to Lycoming Natural Gas Corporation or its predecessor in title. Searle thereafter permitted Mrs. Carmer to occupy the surface of the land for agricultural purposes and as a chicken farm, but posted the land with trespass notices in his own name.

The facts above stated are not in dispute. It is urged on behalf of the defendants that Mrs. Carmer's surrender agreement was effective to divest her of the equitable title to the land which she acquired on the execution of her contract with Mrs. Bly, September 11, 1926, and that the surrender of the land contract operated to extinguish the rights of the plaintiffs under the lease.

It is urged on behalf of the plaintiffs:

(*a*) That the "surrender agreement" was not effective to convey Mrs. Carmer's equitable title, because her living husband did not join therein.

(*b*) That Mrs. Carmer, the purchaser of the land under the contract, could not affect the rights of those who acquired an interest therein from her by a subsequent surrender of the contract. No cases have been cited to the court in which these questions have been exactly ruled.

The Act of 1893, P. L. 344, 48 PS § 31, provides that a married woman "may not mortgage or convey her real property, unless her husband join in such mortgage or conveyance." And section 2 of the act, 48 PS § 32, provides that "she may not execute or acknowledge a deed, or other written instrument, conveying or mortgaging her real property, unless her husband join in such mortgage or conveyance."

Upon the execution of the contract, Mrs. Carmer became vested with an equitable estate in the land, which might be sold, charged, encumbered, and levied upon as hers. It was real estate and subject in her hands to all the incidents of real estate, and as such would descend to her heirs. She is considered in equity as the owner, subject only to the payment of the purchase money. Her interest was not circumscribed by the purchase money paid, but she was entitled to all of the advantages and liable for all losses accruing after the date of the contract: Chahoon et al. v. Hollenback, 16 S. & R. 425; Ives v. Cress, 5 Pa. 118; Kerr et al. v. Day, 14 Pa. 112; Reed v. Lukens, 44 Pa. 200; Hall v. Vanness et al., 49 Pa. 457; Spratt v. Greenfield et al., 279 Pa. 437.

It is well settled that a married woman may do anything in a contractual way concerning her real estate except that she may not mortgage or convey unless her husband joins in such mortgage or conveyance. "Under the Act of 1893 a married woman may 'sell' her real estate and make any contract 'necessary, appropriate, convenient or advantageous' to the exercise of her right to sell; but she may not perform her contract to sell without the joinder of her husband in the conveyance." McCoy v. Niblick, 221 Pa. 123, 127.

Upon the execution of the land contract in 1927, Mrs. Carmer was, under the long line of cases above cited, immediately vested with an interest in the real estate. She could contract to divest herself of that interest but could not perform her contract so to do—could not actually divest herself of that interest, except by a conveyance in which her husband joined. This he did not do.

At first glance, it might seem that, if a married woman might make a valid contract to purchase land, she might rescind or surrender the contract so made. The distinction, however, is that the surrender of the contract serves to divest her of title and is therefore a conveyance. It operates not as a contract to divest herself of the title but as the actual instrument by which she is divested thereof. That the surrender agreement did divest Mrs. Carmer of her title is the very essence of the defendants' contention. Moreover, the surrender agreement is self-denominated a conveyance. As such it was not effective because it was not joined in by Mrs. Carmer's husband.

If the question before the court were the right of Mrs. Carmer to convey her equitable title to a third person by an assignment or conveyance in which her husband did not join, we doubt if it would be urged that she could, in the face of the statute, convey her interest in land by an instrument in which her husband did not join. It is impossible to see a distinction between the conveyance of her equitable title to a third person and the reconveyance of her equitable title to her grantor. The court is of the opinion that the statute not only requires her husband to join in a conveyance of her equitable title to a third person, but also to join in her conveyance of her equitable title back to her vendor, and that since her husband did not join in the surrender agreement it is ineffectual to divest her of her equitable title.

Had Mrs. Carmer assigned her entire interest, with her husband joining in the assignment, she would, under the rule laid down in Taylor et al. v. Preston, 79 Pa. 436, 440, have remained in the position of trustee for her assignee. The conclusion seems irresistible that the same rule which would apply upon the

assignment of the whole would apply, upon the assignment of a part, to the part assigned, and that as the lessor of the plaintiffs' predecessor in title she occupied the position of a trustee for her lessee.

By the lease under seal, with covenants of general warranty, Mrs. Carmer parted with, and her lessee acquired, an interest in land, a corporeal and not an incorporeal hereditament. The lease vested in the lessee the title to all the oil except one eighth, and also the title to all the gas: Barnsdall v. Bradford Gas Co., 225 Pa. 338.

If Mrs. Carmer stood in the position of trustee for her assignee of the oil and gas she certainly could not surrender her assignee's interest, or by her surrender divest the cestui que trust of a valuable interest in land. Even though Mrs. Carmer be not considered as a trustee for her lessee, she could not surrender what she no longer had. She had parted with whatever interest in the land her lease conveyed to her lessee, that interest was no longer hers to surrender. This reasoning is supported by decisions in several other States.

In New York, in the case of The Attorney General v. Purmort et al., 5 Paige 620, affirmed in 16 Wend. 460, 30 Am. Dec. 103, the facts appeared as follows: McCrea contracted to sell to Purmort. Purmort mortgaged to the State. The State foreclosed. At the foreclosure sale, the Controller bid in the land in McCrea's name, understanding he was authorized so to do by McCrea. McCrea refused to pay the bids, was sued by the Attorney General, and a verdict obtained, but judgment was arrested. McCrea deeded to Purmort under a "new arrangement". The Attorney General, treating the first foreclosure as a nullity, began a new suit to foreclose. The chancellor said (p. 627) : "Indeed, it was impossible for the original parties to make any valid agreement to rescind this contract, without the assent of the state, which had become the equitable assignee thereof by virtue of the mortgages."

In Kentucky, in the case of Commercial Building & Trust Co.'s Assignee v. Wright, 23 Ky. L. 1428, 65 S. W. 336, the facts appeared as follows: Wright contracted to Hill and gave a title bond which was not recorded. Hill sold to Mrs. Heaton by deed duly recorded. Mrs. Heaton mortgaged to the trust company. The trust company foreclosed. Hill then surrendered to Wright. The court said: "Her rights to the property had attached, and no agreement which Hill and Wright could make could affect them."

In Washington, in the case of Scott v. Farnam et al., 55 Wash. 336, 340, 104 Pac. 639, the court said: "Passing to a consideration of the principal question, we find that it is well settled, that a vendee in possession of property under a contract of sale has an interest which can be conveyed or mortgaged; that a mortgage by the vendee operates as an equitable assignment of his interest in the property; that when the vendee has mortgaged the property and the vendor has notice of that fact, he cannot enter into a new contract for a rescission without the consent of the mortgagee or giving him an opportunity to perform the contract; that the mortgagee of the vendee in virtue of his mortgage acquires the right to complete the purchase if the mortgagor fails or refuses to do so; that the recording of the mortgage is notice to any subsequent purchaser from the vendor of the mortgagee's right to purchase the property under the contract if the vendee does not perform the conditions of the contract."

In Illinois, in the case of McCauley et al. v. Coe et al., 150 Ill. 311, 37 N. E. 232, the same principle is recognized.

In Alabama, in the case of Davis & Son v. Mulligan, 88 Ala. 523, 6 So. 908, the syllabus reads: "A duly recorded mortgage on the interest of a vendee holding a bond for title is valid as against the vendor to whom the land is afterwards surrendered, and his subsequent vendee, though neither had actual knowl-

edge of it." As reported, sufficient facts are not stated to show that the syllabus writer is correct. However, no reported facts are inconsistent with his statement.

The principle asserted by counsel for the plaintiff seems to accord with the fundamentals of justice. Any other rule would be unjust and inequitable. To hold that the vendee under articles may, by secret surrender, extinguish an estate he himself has conveyed would open wide the door to fraud. Such a rule offends good conscience.

In order to frame a decree that will do equity to all the parties in this proceeding, it is necessary to consider the third issue raised by the pleadings, as above stated.

The court has found as a fact that the whole transaction testified to by the defendants is unconscionable and so unworthy of belief that a court of equity cannot sustain any rights acquired thereunder by Ralph J. Searle.

The court has also found as a fact that the transaction was the result of a conspiracy between the defendants for the purpose of defrauding Lycoming Natural Gas Corporation of its property and rights under the lease, that it was an attempt to obtain title to the land in controversy free and clear of the lease, and that it was fraudulent.

Mrs. Carmer first met Searle when he and Sloane called upon her in the fall of 1931. Searle was seeking an interest in the oil and gas rights in Mrs. Carmer's property. She was dissatisfied with the terms of her lease. Searle and Sloane took her husband to Corning, N. Y., to consult with Mr. Sebring, and they went with Mr. Sebring to confer with representatives of the plaintiff company in an endeavor to secure a modification of the lease. Mr. Sebring was employed to contest the validity of the lease and to relieve the land from the alleged cloud on the title created thereby. The common purpose Mrs. Carmer and Searle desired to accomplish was to divest the plaintiff company of its rights under the lease. There is some dispute as to what happened when the defendants together visited Mrs. Bly on January 7th. Certain facts appear conclusively proven. The consideration paid to Mrs. Bly by Searle was the exact amount remaining unpaid upon the land contract plus $30 which Mrs. Carmer owed to Mrs. Bly's mother. The court is convinced, from the testimony, that Mrs. Bly's deed was procured for that consideration under the color of the contract, and that she made the conveyance because she understood that she was obliged to do so by the terms of her contract.

It would be inequitable to permit Searle to benefit by the use of the contractual relation between Mrs. Bly and Mrs. Carmer and avoid the burden of the lease which Mrs. Carmer had assumed while she was in possession of the property under the contract. If Mrs. Carmer and Searle did not procure the conveyance as a consummation of the contract, if they fully explained to Mrs. Bly that Mrs. Carmer was surrendering the land back to her and Searle was making a new deal for its purchase, the consideration was grossly inadequate. It is beyond the bounds of belief that they could have explained to her the surrender, that the property was hers, and told her, as they say they did, about the gas well. Had they done so, she would not have parted with her property for a price so grossly inadequate; approximately one half of the contract price.

Mrs. Bly says: Mrs. Carmer "said Mr. Searle was going to finish paying up what she owed on the place." "I understood Mrs. Carmer to say she had come to finish up paying for the place; that Mr. Searle was going to let her have the money to do so." She further stated definitely: "Q. Did they explain they were surrendering the property back to you? A. I didn't understand it that way."

Furthermore, Searle went to the conference fully prepared with the necessary papers, drawn in such a way as would lend the color of verity to the

story which he and Mrs. Carmer now in concert tell upon the stand. The fact that an exactly similar scheme was conceived and attempted by Searle upon the neighboring property of Amos and Nellie L. Sturdevant (No. 6, March Term, 1932, Common Pleas of Potter County, in equity) is further indicative of his authorship of the fraudulent design disclosed in this case.

According to the defendants' story, we have here a rather unusual chain of circumstances. Searle wants the oil and gas right in Mrs. Carmer's farm. Mrs. Carmer becomes dissatisfied with the lease she has given and convinced she cannot pay for the place. She determines to surrender and be quit of a property in which she has invested $400, and which, since the completion of the big gas well nearby, bids fair to pay her a substantial annual rental. By chance, Searle learns of her determination, gets his papers prepared, goes with her to see Mrs. Bly, finds her willing to sell the property, after its surrender back to her, for a fraction of the original price, and consummates the transaction. This is exactly the same chain of circumstances we found operating in Searle's behalf in the case of the Sturdevants; exactly similar in each essential phase. Standing alone either case might possibly be within the range of credibility. But when we are asked to believe that fate operated for the same man, in the same way, at practically the same time, in two unrelated transactions, credulity revolts.

In Hall v. Vanness et al., 49 Pa. 457, it appears that Hall died, leaving a widow and children. The widow surrendered her deceased husband's land contract and took a new one in her own name. This she assigned to Vanness, who surrendered the assigned contract and took another in his own name. The Supreme Court said (p. 463) : "If these surrenders were induced by fraudulent and improper means and with a view to defeat any equity the heirs might have in the land, the title obtained through such a process will be insufficient to hold the land as against them: Wykoff v. Wykoff, 3 W. & S. 481." This case further holds that, if Vanness acquired his interest honestly, he would be entitled to the purchase money he paid with interest, but, if fraudulently procured, "a recovery by the heirs, or either of them, might be had against him, without a tender or offer of the purchase-money."

In Bleakley's Appeal, 66 Pa. 187, it appeared that Irvin was the owner of an equitable title to land under a contract. Lamberton obtained judgment against him on June 8th. On July 19th Irvin assigned his contract to Bleakley, but antedated the assignment to May 1st to overreach Lamberton's judgment. The Supreme Court not only sustained the finding that this was done to defraud Lamberton, but also sustained the chancellor in refusing, in effect, to require Lamberton to refund to Bleakley the balance of the contract price which Bleakley paid to Lamberton after the fraudulent assignment.

We now come to the consideration of what decree, under the pleadings and findings, is an appropriate remedy in this case.

It is the duty of a court of equity, when fraud has been found to have operated upon the affairs of the parties, to return them, as nearly as may be possible, to the situation in which they were when the fraud began to operate. Before this fraudulent scheme was conceived and set in motion by Searle, Mrs. Carmer was the owner of the land in controversy, subject only to the payment of the balance of the purchase money, and to the rights acquired from her by her lessee and its successors in title. The balance of the purchase money has now been paid. The vendor has not been hurt. Mrs. Bly has received all the purchase price for which she originally contracted. Searle is not entitled to have the money he paid to Mrs. Bly refunded to him. "It would be a singular exercise of equity, which would assist a party, who had paid money to enable him to perpetrate a fraud, to recover his money, just when the chancellor was

engaged in thrusting out of the way of his doing equity to the injured party, the very instrument of the fraud. Who does inequity shall not have equity: [Hershey v. Weiting, 50 Pa. 240, 245]": Bleakley's Appeal, 66 Pa. 187, 191.

The plaintiff, Lycoming Natural Gas Corporation, had certain rights under the lease, now vested in Lycoming Producing Corporation, which the court is asked to protect by decree:

(a) That Searle holds the land subject to the lease;

(b) That he holds the oil and gas therein in trust for those entitled thereto under the lease. It is found as a conclusion of law that he holds the land also in trust for Mrs. Carmer;

(c) Enjoining Searle from leasing the land for oil and gas purposes;

(d) Enjoining Searle from conveying any interest in the land, except subject to the lease;

(e) Enjoining the Carmers from interfering in any way with the exercise of the plaintiff's rights under the lease.

The court is further asked to make such order as will protect the rights of the plaintiff, acquired by it under the lease from the equitable owner of the land.

The simplest and surest way of reaching the proper results would seem to be to require Searle to execute and record a deed conveying to Mrs. Carmer the legal title to the land in controversy, subject to the lease, thereby removing any cloud from the title of the plaintiff, securing it in its rights, and returning Mrs. Carmer to the situation in which she was when the fraud began to operate. However, such a decree does not seem to be within the relief prayed for in the bill and it is well settled that the relief granted should conform to the prayer.

*Decree nisi*

And now, June 26, 1933, upon consideration of the foregoing case it is ordered, adjudged and decreed as follows:

That the defendant, Ralph J. Searle, holds the land described in the findings of fact subject to that certain lease given by the defendants, Gertrude Carmer and Roswell Carmer, her husband, to the Peoples Natural Gas Company under date of October 8, 1930, recorded in the Office of the Recorder of Deeds in and for Potter County on November 1, 1930, in lease book vol. 6 at page 115, and set forth in full in the findings of fact.

That the defendant, Ralph J. Searle, holds the record, legal title to the said land subject to said lease in trust for the defendants, Gertrude Carmer and Roswell Carmer, her husband, and the record, legal title to the oil and gas under said land in trust for the benefit of those entitled thereto under the terms of the said lease.

That an injunction issue perpetually restraining and enjoining the defendant, Ralph J. Searle, from leasing the said land for oil and gas purposes, and from conveying the same or any interest therein except subject to the rights of the plaintiff, the Lycoming Producing Corporation, under said lease, and subject to the rights of the defendants, Gertrude Carmer and Roswell Carmer, her husband, under said lease.

That an injunction issue perpetually restraining and enjoining the defendants, Gertrude Carmer and Roswell Carmer, her husband, from interfering in any way with the exercise of the rights of the plaintiff, Lycoming Producing Corporation, under the said lease in and on the land in controversy.

That the costs be paid one half by Ralph J. Searle, and one half by Gertrude Carmer and Roswell Carmer, her husband.

The prothonotary is directed to file this adjudication and with it the requests for findings of fact and conclusions of law submitted on behalf of the plaintiff

and defendants; to enter this decree nisi; to enter the same on the judgment index; to give notice of the entry thereof to the parties or their counsel of record; to file acceptances of service of said notices; and if no exceptions are filed within 10 days from service of said notices the decree nisi shall be entered as the final decree by the prothonotary as of course.

## Amended decree nisi

And now, June 30, 1933, counsel for the plaintiffs having petitioned this court for leave to amend the original bill of complaint by adding thereto two additional prayers for relief, and leave to amend having been granted, it is ordered, adjudged, and decreed that the decree nisi entered June 26, 1933, is amended, and the prothonotary is directed to enter the amended decree nisi as follows:

And now, June 30, 1933, upon consideration of the foregoing case, it is ordered, adjudged, and decreed as follows:

That the defendant, Ralph J. Searle, holds the land described in the findings of fact, subject to that certain lease given by the defendants, Gertrude Carmer and Roswell Carmer, her husband, to Peoples Natural Gas Company, under date of October 8, 1930, recorded in the office of the Recorder of Deeds in and for Potter County on November 1, 1930, in Lease Book vol. 6, page 115, and set forth in full in the findings of fact.

That the defendant, Ralph J. Searle, holds the legal title to the said land, subject to said lease, in trust for the defendant, Gertrude Carmer, and the legal title to the oil and gas under said land in trust for the benefit of those entitled thereto under the terms of the said lease.

That the defendant, Ralph J. Searle, be and is required to execute and record within 10 days after the entry of final decree a deed in form approved by this court, conveying to Gertrude Carmer the legal title to the land in controversy as described in the adjudication of this court, subject to the oil and gas lease now held by Lycoming Producing Corporation, and more fully described in the adjudication of this court.

That an injunction issue perpetually restraining the defendant, Ralph J. Searle, from leasing the said land for oil and gas purposes, or conveying the same, or any interest therein, pending his full compliance with this order.

That an injunction issue, perpetually restraining and enjoining the defendants, Roswell Carmer and Gertrude Carmer, his wife, from interfering in any way with the exercise of the rights of the plaintiff, Lycoming Producing Corporation, under the said lease in and on the land in controversy.

That the plaintiff, Lycoming Producing Corporation, shall pay or tender all accumulated and unaccepted delay rentals to Gertrude Carmer, and shall pay to her, her heirs or assigns, all delay rentals, royalties, and well rentals, as the same may become due under the terms of the lease.

That the costs be paid, one half by Ralph J. Searle, and one half by Roswell Carmer and Gertrude Carmer.

That the prothonotary is directed to enter this decree nisi; to enter the same on the judgment index; to give notice of the entry thereof to the parties or their counsel of record; and to file acceptance of service of said notices.

An extension of time for 10 days from this date is hereby granted to the defendants in which to file exceptions to the findings and decree of the court in this case. If no exceptions are filed within 10 days from service of said notices, the amended decree nisi shall be entered as the final decree by the prothonotary as of course.

November 9, 1933, exceptions withdrawn on motion of defendants' counsel.

From Archibald F. Jones, Coudersport, Pa.